RECEIVED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE 11/7/05
CB

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **JOY NEWSOM** | * | **CIVIL ACTION NO. 04-2255** |
| **VERSUS** | * | **MAGISTRATE JUDGE HILL** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **BY CONSENT OF THE PARTIES** |

## REASONS FOR JUDGMENT

The undersigned was referred this social security appeal by consent of the parties. For the reasons set forth below, the Commissioner's decision is **REVERSED,** and claimant is awarded benefits commencing November 9, 2001.

### I. Background

The claimant, Joy Newsom ("Newsom"), age 48, filed applications for disability insurance benefits and supplemental security income payments on the basis that she was disabled due to congenital hip dysplasia, bladder problems, social anxiety disorder, and post-traumatic stress disorder. She was a high school graduate, and had past relevant work experience as a seamstress, greeter, general laborer, attendant, housekeeper, and bank teller.

Newsom had a childhood history of developmental dysplasia of both hips. On October 3, 2001, she saw Dr. Michael Dawson, an orthopedist, for complaints of a

popping sensation and a sharp pain in the left groin for the past year. On examination, she had a normal gait. Her left hip was irritable. Left hip flexion and abduction were limited. X-rays showed significant lack of coverage of the left hip with shortened femoral necks on both hips.

Dr. Dawson's diagnosis was a dysplastic left hip with insufficient coverage on the left side. He prescribed Celebrex, and referred her to Dr. James Goulet.

Dr. Goulet saw Newsom on October 30, 2001. Examination and x-rays revealed significant bilateral dysplasia, worse on the left. He recommended corrective osteotomy surgery, which he performed on January 7, 2002.

On March 26, 2002, claimant reported that she was doing somewhat better. X-rays showed that the hardware was intact, and there was good alignment. The osteotomy sites appeared healed, except for the pubis. She was referred for physical therapy, and given a refill for OxyContin.

Claimant reported that her pain had improved greatly on July 2, 2002. She was able to ambulate even without her cane, but limped slightly. X-rays showed good callus formation around the osteotomy site. Dr. Goulet opined that Newsom was improving as far as her pain, strength, and mobility, and recommended further physical therapy. He gave her a work release for at least the next two months.

On September 3, 2002, claimant was experiencing less pain. She was ambulating with a cane outside and unassisted indoors. She still had pain primarily in her groin, and sometimes into her buttocks. She continued to have a problem with stair climbing because of leg weakness.

On examination, Newsom ambulated with a limp. She could flex the hip to 100 degrees and abduct 40 degrees. She continued to have decreased sensation across the lateral left thigh, as well as extremely weak abductors and knee extensors.

X-rays showed a well-healed osteotomy with intact hardware. The joint space was well maintained, with no impingement.

Dr. Goulet reported that claimant was doing well. He gave her a prescription for continued physical therapy to avoid assisted flexion. He continued her current level of medications of OxyContin and Vicodin.

Also in September, 2002, claimant's physical therapist, Robert Leffler,[1] reported that claimant had undergone physical therapy for several months, and had been discharged secondary to clinical plateau. At discharge, she displayed an average LE strength deficit of 49.4%. She also had a moderate antalgic gait pattern. Mr. Leffler opined that claimant "displays significant functional limitations as a result of

---

[1] Physical therapists qualify as "other sources" under 20 C.F.R. § 404.1513(e) which sources may be considered but are entitled to significantly less weight than "acceptable medical sources." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

her hips." (Tr. 211).

On November 5, 2002, claimant reported that she was generally doing well. She was unable to ambulate without assistance. She experienced some spasms in her quadriceps when descending stairs and going down inclines.

On examination, Newsom continued to ambulate with a slight limp and had extremely weak iliopsoas. Her quadriceps strength had improved. X-rays showed some slight narrowing of the joint space.

Dr. Goulet opined that claimant was doing well. He prescribed Oxycontin and Vicodin, and instructed her to continue to work on decreasing use and to continue her home strengthening program.

On January 7, 2003, Newsom saw Dr. David Muldowny after moving from Michigan to Louisiana.[2] She reported that her problems were getting worse in the left hip. She described her pain as constant, waking her up at night and increasing with activity. She also complained of generalized muscle weakness. Her medications included OxyContin, Vicodin and Wellbutrin.

On examination, Newsom was 5 feet 1 inch tall and weighed 125 pounds. She had an antalgic gait to the left. She had tenderness to palpation of the lumbar spine. Muscle strength was 5/5 in all groups. External and internal rotation of the right hip

---

[2]Except for Dr. Muldowny, all of claimant's medical treatment occurred in Michigan.

was 40 degrees.

On left hip examination, claimant had tenderness to palpation over her incision. External and internal rotation was 20 degrees. She had normal toe walking, heel walking and tandem gait. Deep tendon reflexes were +2 and equal bilaterally. Sensation was intact.

Pelvic and hip x-rays showed developmental dysplasia of both hips. There was mild to moderate degenerative changes of the left hip. The osteotomy appeared healed.

Dr. Muldowny's impression was developmental dysplasia of both hips and status-post periacetabular osteotomy. He noted that claimant was currently taking two Oxycontin and three to four Vicodin per day. He opined that "I think it is probably unlikely that she will be able to go back to doing anything full time because of her pain and the amount of medication that she is using." (Tr. 209).

On July 28, 2003, claimant was doing reasonably well.[3] She was off of the Duragesic, and was down to two Vicodin per day and Vioxx. She had been making good progress with physical therapy. On examination, she had a weak hip flexor, but her muscle strength was 5/5. Dr. Muldowny noted that claimant wanted to continue

---

[3]The following records from Dr. Muldowny were presented to the Appeals Council. (Tr. 218B-218F).

5

to wean herself off of Vicodin. He prescribed Celebrex and Ultracet, and discontinued Vioxx.

October 9, 2003, claimant stated that physical therapy had not really helped all that much, and that she was still having pain in the groin and hip. Dr. Muldowny opined that she had probably received as much as she would get out of the periacetabular osteotomy. He noted that she might end up needing a hip replacement. On October 30, 2003, Dr. Muldowny wrote that Newsom was unable to work pending treatment.

On January 8, 2004, claimant complained that her hip was doing much worse. She ambulated without assistive devices. She was taking Vioxx, which helped some. She was interested in pain management and in pursuing whether she needed a hip replacement. Dr. Muldowny recommended that she see a specialist in complex hip reconstructions, and referred her to Dr. John Martin for pain management. He also prescribed Vicodin, since it had worked fairly well before.

Claimant also had a history of emotional problems. On May 15, 2000, she presented to Greenbrook Recovery with significant anxiety and symptoms of panic disorder. She had a history of alcohol and cocaine abuse. She had been through rehabilitation twice, and had been in remission for seven months at the time of admission. She also had a lifelong history of symptoms of social phobia.

Dr. Michael Brooks' diagnosis was alcohol and cocaine dependence, social phobia, and panic disorder. Her Global Assessment of Functioning ("GAF") score was 50. He prescribed Paxil, and recommended that Newsom continue with individual therapy and 12-step recovery meetings.

On January 15, 2002, claimant's therapist, Constance M. Schuby, reported that Newsom had been treated on an outpatient basis since August 15, 2000. She had been abstinent since January 28, 2000. Ms. Schuby stated that all drug screens had been negative, and that Newsom appeared sincere regarding her commitment to abstinence and recovery.

Claimant was referred for consultative examination to psychologists Harold Stephen Bilotta, Jr. and James P. Steyaert on January 31, 2002. Mentally, she stated that she had always had anxiety.

On examination, Newsom had good posture, and was neatly groomed and dressed. She stated that she forgot things a lot. She was able to feed and dress herself, but needed assistance with socks and other things sometimes. She appeared to be extremely focused on herself and her symptoms.

Claimant had feelings of worthlessness because she was unable to do things. She had trouble sleeping due to constant pain. She was tearful, and presented with a flat affect and dysphoric mood. She was oriented to time, person, and place.

7

Newsom's diagnoses were adjustment disorder with depressed mood; alcohol and cocaine dependence, by history; congenital hip dysplasia, a history of bladder infections, and chronic pain, and occupational, emotional, and medical issues. Her GAF score was 49. Her prognosis was guarded. She was able to manage her benefit funds.

Additionally, Newsome was treated for recurrent cystitis and urethral stenosis by Dr. Konda B.C. Mouli. On May 1, 2001, Dr. Mouli performed a cystoscopy and urethral dilation. Post-surgery, claimant continued to complain of urinary frequency to her gynecologist, Dr. Robert E. Young.

At the hearing on March 12, 2003, Newsom was unrepresented. She complained of hip dysplasia, social anxiety, post-traumatic stress disorder, bladder infections, depression, and substance abuse. She reported that she had been clean and sober for three years.

Claimant testified that she was taking OxyContin, Vicodin, and Vioxx. She rated her pain as 5 on a scale of 1 to 10. She stated that her pain was a little bit better, but different, since the surgery. She reported that she had to get up four or five times a night to urinate.

Regarding her depression, Newsom testified that she was not currently being treated by a psychologist or psychiatrist. She stated that she had not seen a counselor since the previous year. She reported that she was taking Wellbutrin for depression.

As to restrictions, claimant stated that she could lift about five pounds. She reported that she could stand comfortably for 15 minutes. She said that she could walk about half a block before starting to limp. She testified that she could sit comfortably for half an hour.

Claimant reported that she was able to dress and groom herself. She read, watched television, and visited with her family. She also attended AA meetings twice a week.

## Law and Opinion

On appeal, claimant argues that the ALJ erred: (1) in failing to find her disabled at Step 3, in light of the medical findings and opinions of the treating physicians, and (2) in relying on the vocational expert's testimony to find her not disabled at Step 5. Because I find that the ALJ erred in finding that claimant had the ability to maintain employment, I order that the Commissioner's decision is **REVERSED** and that the claimant is awarded benefits.

The record reflects that claimant underwent a left periacetabular osteotomy on January 7, 2002. On March 26, 2002, her treating physician, Dr. Goulet, noted that

Newsom "will need several additional months of rehabilitation before she can consider returning to even a sedentary job." (Tr. 198). Ten months post-surgery on November 5, 2002, claimant was still taking OxyContin and Vicodin. (Tr. 205). When she saw Dr. Muldowny less than three months later, he noted that "it is probably unlikely that she will be able to go back doing anything full time because of her pain and the amount of medication that she is using." (Tr. 209).

The ALJ noted that Dr. Muldowny evaluated claimant on only one occasion before rendering his opinion. (Tr. 24). Subsequent reports from Dr. Muldowny which were submitted to the Appeals Council indicate that Newsom continued to suffer from significant pain for which she was taking Vicodin. (Tr. 218 B, 218F). On October 30, 2003, Dr. Muldowny wrote that claimant was "currently unable to work pending treatment." (Tr. 218C).

The record reflects that as of the time of Dr. Goulet's last report, which was available to the ALJ, Newsom was taking OxyContin and Vicodin. (Tr. 205). She was still on these medications when she first visited Dr. Muldowny, which report was also available to the ALJ. (Tr. 207-09). These are both narcotic medications designed for the relief of moderate-to-severe pain. Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or

other symptoms." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing 20 C.F.R. § 404.1529(c)(3)(iv)). The medication which claimant was taking is absolutely consistent with her continued complaints and the objective medical evidence. The ALJ did not take the claimant's medication into consideration, and his failure to do so was error.

Further, neither claimant's treating surgeon, Dr. Goulet, nor her subsequent treating physician, Dr. Muldowny, had released claimant to return to work. In fact, Dr. Muldowny opined that Newsom was unable to work "pending treatment." (Tr. 218C). The records reflect that claimant was still receiving treatment in the form of narcotic pain medication both at the time of and subsequent to the ALJ's decision.

A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job she finds for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) (citing *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)). According to her treating physician, claimant would be unable to maintain gainful employment. Thus, the ALJ erred in his determination that claimant retains the capacity for work.

Because the ALJ erred in finding that claimant had the ability to maintain employment, it is ordered that the Commissioner's decision is **REVERSED**, and the claimant is awarded appropriate benefits commencing November 9, 2001.

Signed this ___6___ day of ___November___, 2005, at Lafayette, Louisiana.

*C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE